## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SHANTEL MORRIS,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **SUGARHOUSE HSP GAMING, L.P.,** | **NO.  24CV1916** |
| **Defendant.** | |

### MEMORANDUM OPINION

Plaintiff Shantel Morris, a Black woman previously employed at SugarHouse HSP Gaming, L.P. d/b/a Rivers Casino Philadelphia ("SugarHouse" or the "Casino"), has sued SugarHouse for racial discrimination, retaliation, and a hostile work environment in violation of 42 U.S.C. § 1981 ("Section 1981") and the Pennsylvania Human Relations Act (the "PHRA"), 43 Pa. Cons. Stat. § 951, *et seq*.  The Casino now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

### I.    FACTUAL BACKGROUND

Except as otherwise noted, the following facts are not in dispute.

Morris was hired by Denise Harris—a White woman—to work as a Count Room Attendant.  Things went well for the first year.  Harris, as Morris's supervisor, gave her positive evaluations and promoted her to Count Room Lead.  But, a year and a half in, things began to sour.  Morris (as well as two White Count Room Attendants) complained that Harris was showing "favoritism" to a Puerto Rican employee—assigning her "easy" work and treating her more favorably when it came to getting time off approved.  After that, Morris noticed that other employees at the Casino were offered to work overtime more frequently than her and that Harris began "nitpicking about everything that she did."  She also heard from a coworker that Harris

1

had referred to her as "schizophrenic."

Then Harris issued Morris her first "Performance Improvement Notice" ("PIN"), a write-up for not following proper Count Room protocol, which concerned money that had been left overnight in a container that was supposed to be empty—meaning that it had not been properly counted in the previous evening's tally.  Another PIN followed a couple of months later: When Morris lost a key, Harris initially told her that she would not make an issue of it so long as Morris found and returned it by the next shift.  When another employee found and returned the lost key, Harris wrote her up.  In response to either the first or second PIN, Morris complained to Roshima Bates—Harris's supervisor—about the favoritism she says she had witnessed, how she had complained to Harris but that nothing had changed, and that she now felt as though she was being picked on in the Count Room.  A week after issuing the second PIN, Harris once again wrote Morris up—her third PIN—after she mistakenly reported that fourteen (rather than thirteen) boxes of money had been counted.

Following the PINs, Morris maintains that Harris continued to "nitpick" her because:

- A request for time off was changed from being previously labeled as "approved" to "pending."  When Morris complained to Harris, the time off request was changed back to approved.

- Harris required Morris to get her headband and watchband checked by security which, in Morris' view was discriminatory because she was the only African American Count Room employee and had to wear a headband to keep her "nappy" hair under control.

- Then Harris gave Morris a bottle of wine with the word "Devil" prominently displayed on the label.  Although Morris thanked Harris for the gift that day via text message, she later testified that the label's inclusion of the word "Devil" was another instance of discriminatory "nitpicking."

Things came to a head in Morris's second year as a Casino employee.  Harris reported to Human Resources that Morris had been sleeping on the job and requested that she be fired.  A Human Resource officer, after reviewing the Casino's security footage, concluded that, while she

had not been asleep on the job, she was refusing to do any work.  About a week later, Harris

reported again that Morris had been sleeping on the job, the security footage confirmed as much[1]

and her employment was terminated.

## II.    LEGAL STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Inferences to be drawn from the underlying

facts contained in the evidential sources must be viewed in the light most favorable to the party

opposing the motion."  *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34

(3d Cir. 1987).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record

evidence, could rationally find in favor of the non-moving party in light of his burden of proof."

*Doe v. Abington Friends Sch.*, 480 U.S. 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  "The non-moving party may not

merely deny the allegations in the moving party's pleadings; instead he must show where in the

record there exists a genuine dispute over a material fact."  *Id.* (citation omitted).  A moving

party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a

sufficient showing on an essential element of her case with respect to which she has the burden

---

[1] Although Morris denies that she was sleeping on the job, multiple Casino employees reviewed video evidence and concluded that she was.  Her bald denial does not undermine that conclusion.  *See, e.g. Tomaso v. Boeing Co.*, 446 F.3d 702, 706 (3d Cir. 2006) (quotations omitted).

of proof." *Celotex*, 477 U.S. at 323.

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . .  More important . . . summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III.    DISCUSSION

Morris sued the Casino for violating the PHRA and Section 1981. The PHRA makes it unlawful "[f]or any employer because of the [employee's] race" to "discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract." 43 Pa. Cons. Stat. § 955(a). And Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts." 42 U.S.C. § 1981(a).

As a preliminary matter, although Morris did not bring a claim under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, discrimination and hostile work environment claims brought under Title VII, the PHRA, and Section 1981 are generally evaluated under the same framework. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

### A.  Hostile Work Environment

To succeed on her hostile work environment claim, Morris "must show" that: (1) she "'suffered intentional discrimination because of'" her race; (2) "'the discrimination was severe or pervasive;'" (3) it "'detrimentally affected'" her; and, (4) it "'would detrimentally affect a reasonable person in like circumstances.'" *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir.

4

2017) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).  To

determine employer liability, Morris also must show that *respondeat superior* liability exists.

*Mandel*, 706 F.3d at 167.

The Casino argues that Morris cannot establish any of the instances of purported

harassment had anything to do with her race, nor that said instances were so severe or pervasive

that they would detrimentally affect a reasonable person.

### i.    Intentional Discrimination

As for the first element of a hostile work environment claim, although "[m]any may

suffer severe or pervasive harassment at work, . . . if the reason for that harassment is one that is

not proscribed by Title VII," Section 1981, or the PHRA, then "it follows that" such statutes

"provide[] no relief."  *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled in part on

other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  The "first

step, therefore, requires [the Court] to identify what harassment, if any, a reasonable jury could

link to" discriminatory animus.  *Id.* at 449-50 (citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d

271, 280-81 (3d Cir. 2000); *Shaner v. Synthes,* 204 F.3d 494, 500-01 (3d Cir. 2000); *Aman v.

Cort Furniture,* 85 F.3d 1074, 1081-83 (3d Cir. 1996)).

In that a plaintiff is "never required . . . to demonstrate direct proof that her harasser's

intent was to create a discriminatory environment," *Abramson v. William Paterson Coll. of N.J.,*

260 F.3d 265, 278 (3d Cir. 2001), "the record must be evaluated as a whole," concentrating "'not

on individual incidents, but on the overall scenario.'"  *Cardenas v. Massey*, 269 F.3d 251, 260-

61 (3d Cir. 2001) (quoting *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999)).

That is because "it is often difficult to determine the motivations of an action;" therefore, "the

advent of more sophisticated and subtle forms of discrimination requires that [the Court] analyze

the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Id.* at 261-62 (quoting *Durham*, 166 F.3d at 149).

For several of Morris's complaints—the schizophrenia accusation, the Devil-themed wine bottle, and the time off request mix-up—she failed to adduce evidence that any "racist comment, written or spoken, was ever directed at" her. *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005). In such cases, a plaintiff typically fails to establish a hostile work environment claim. *Id.* And although she complains that she was given less favorable job assignments than a Puerto Rican employee, such evidence standing alone fails to establish a hostile work environment claim. *Woodard v. PHB Die Casting*, 255 F. App'x 608, 608-09 (3d Cir. 2007) (holding that when Black plaintiff adduced evidence that "he was given less favorable job assignments than non-African American employees," such as "more physically demanding tasks," such evidence did not establish a hostile work environment claim). Indeed, the only evidence in the record indicating that the above instances might have had something to do with race is Morris's own deposition testimony detailing that she believed as much, but such "subjective belief . . . is not sufficient to establish an inference of discrimination." *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x 152, 153 (3d Cir. 2013).

Nevertheless, "a rational jury" may conclude that the search of her headband was "based in racial animus." *Onely v. Redner's Markets, Inc.*, 697 F. Supp.3d 410, 429 (E.D. Pa. 2023) (determining that an employer calling a Black employee's braided hair "very offensive" could allow a jury to infer racial animus, due to the "well-established history of discrimination that Black women have faced on account of their hairstyles"). And as for Harris's issuance of the

three PINs when other non-Black employees were purportedly not disciplined,[2] such evidence

could allow a rational factfinder to infer that Harris was acting with some sort of racial animus.

### ii.    *Severity and Pervasiveness*

But these instances do not establish that those events were "severe or pervasive," so her

hostile work environment claim must fail.  *Castleberry*, 863 F.3d at 263.

"Severe harassment and pervasive harassment are not the same thing.  The terms

represent two distinct types of hostile work environment claims."  *De Piero v. Pennsylvania*

*State Univ.*, 2025 WL 723029, at *14 (E.D. Pa. Mar. 6, 2025) (slip op.) (citing *Castleberry*, 863

F.3d at 264) (cleaned up).  "[S]ome harassment may be severe enough to contaminate an

environment even if not pervasive; other, less objectionable, conduct will contaminate the

workplace only if it is pervasive."  *Castleberry*, 863 F.3d at 264.  So, sometimes, a single

incident—if it is severe enough—can support a hostile work environment claim.  *Id.* at 265.  And

so too, many incidents, "which are not individually actionable [can] be aggregated to make out

a . . . claim."  *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006).

Only the most egregious instances of harassment will support a hostile work environment

claim predicated on severity alone.  Indeed, only "extremely serious" misconduct, *Caver*, 420

F.3d at 262-63, such as the use of racial slurs accompanied by threats of termination, or sexual

harassment and assault, will support such a claim.  *Castleberry*, 863 F.3d at 265-66 ("Plaintiffs

alleged that their supervisor used a racially charged slur in front of them and their non-African

American coworkers.  Within the same breath, the use of this word was accompanied by threats

of termination (which ultimately occurred).  This constitutes severe conduct that could create a

---

[2] The Casino vigorously disputes that Morris was disciplined for conduct that non-Black employees were not disciplined for; however, such dispute must be resolved in Morris's favor on summary judgment.  *Peters Twp. Sch. Dist.*, 833 F.2d at 34.

hostile work environment."); *De Piero*, 2025 WL 723029, at *14 (noting that the paradigmatic "severe" harassment case is where the employer utters a racial epithet and threatens termination; collecting similar Third Circuit cases).

The three PINs are not the kinds of incidents that are sufficiently "extreme" to support a hostile work environment claim predicated on "severe" harassment. *See Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 97 (3d Cir. 2020) ("Occurrences such as being ignored . . . , receiving a marginally negative performance review without cause, and scheduling annoyances, while no doubt unpleasant, are not objectively 'extreme,' as is required for a viable . . . hostile workplace claim."). Further, no rational trier of fact could view the headband search, standing alone, as "extremely serious" misconduct. *Caver*, 420 F.3d at 262.

Morris's hostile work environment claim fares no better on a pervasiveness theory. Pervasive harassment is demonstrated by "a continuous period" of misconduct. *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir. 1990). To evaluate such a claim, one looks to the "totality of the circumstances, rather than pars[ing] out the individual incidents." *Mandel*, 706 F.3d at 168; *see also Qin v. Vertex, Inc.*, 100 F.4th 458, 471 (3d Cir. 2024) (directing courts to "'concentrate not on individual incidents, but on the overall scenario,' when analyzing a hostile work environment claim" (quoting *Caver*, 420 F.3d at 262-63)). It is "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" which drives the analysis. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Regarding frequency, when a plaintiff adduces evidence that they were "harassed or bothered on a daily or even a weekly basis," such evidence can support a hostile work environment claim under a pervasiveness theory. *Deans v. Kennedy House, Inc.*, 998 F. Supp.2d

393, 415-16 (E.D. Pa. 2014), *aff'd*, 587 F. App'x 731 (3d Cir. 2014).  But sporadic incidents over a period of several months will not support such a claim.  *Id.*

Here, Morris has only adduced evidence of sporadic incidents—her three PINs and headband search—spread out over a period of eight months; those events are not so frequent that they would support a hostile work environment claim.  *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) ("[T]he seven comments [Plaintiff] identified were spread out over a span of over three-and-a-half years.  The relative infrequency of [Defendant's] remarks—reflecting one or two statements in a given six-month period—indicates that [Defendant's] actions were not severe or pervasive harassment."); *Hamera v. County of Berks*, 248 F. App'x 422, 425-26 (3d Cir. 2007) (affirming district court's conclusion that the plaintiff failed to show that the allegedly harassing comments were pervasive as a matter of law where his coworkers "made nine comments over a year and four months"); *Wright*, 822 F. App'x at 96-97 ("[H]andful of incidents that appear to have been spread out over the course of many months" did not qualify as severe or pervasive enough to constitute a hostile work environment claim.).

While Morris does not charge that any of Harris's conduct was physically threatening, she does, however, assert that her treatment was "humiliating," because the Casino's search of her headband and watchband enforced a racist stereotype that Black people are more likely to be thieves.  Harmful as such a stereotype may be, the record does not show these checks were more than episodic, thus, it does not show that they amounted to a "steady barrage of opprobrious" racially motivated conduct, as required to support a hostile work environment claim under a pervasiveness theory.  *Piety Foley v. Drexel Univ.*, 2024 WL 3540445, at *10 (E.D. Pa. July 25, 2024) (internal quotations and citations omitted).

For all the reasons above, the Casino's Motion for Summary Judgment must be granted

as to Morris's hostile work environment claim.

## B. Disparate Treatment

Neither does Morris's disparate-treatment claim (that she was discriminated against when she was fired) survive on this record. In that the record does not contain "direct evidence of disparate treatment, the *McDonnell Douglas* burden-shifting framework applies" to Morris's claim. *Qin*, 100 F.4th at 472-73 (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). That framework proceeds in three steps. First, the employee bears the burden to establish their *prima facie* case. *McDonnell Douglas*, 411 U.S. at 802. If the employee does so, then the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the" employer's actions. *Id.* If the employer articulates such a reason, the burden then shifts back to the employee, "to show that the defendant's proffered reason is merely pretext for intentional discrimination." *Makky*, 541 F.3d at 214 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)).

The *prima facie* case here requires Morris to show that: (1) she is "a member of a protected class" (the Casino does not dispute that she is); (2) she "was qualified for the position" (the Casino does not dispute that she was); (3) she "suffered an adverse employment action despite being qualified" (she did, *see e.g., Larochelle v. Wilmac Corp.*, 210 F. Supp.3d 658, 691 (E.D. Pa. 2016) ("[T]ermination constitutes an adverse employment action for purposes of her racial discrimination claims.")); and, (4) said adverse employment action "occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky*, 541 F.3d at 214.

Thus, the only question at issue here is whether the evidence in the record indicates that her termination "occurred under circumstances that could give rise to an inference of intentional

discrimination." *Id.*  A plaintiff can show as such by presenting: (1) evidence that similarly situated employees who were not members of the same protected class were treated more favorably under similar circumstances; or, (2) "circumstantial evidence that otherwise shows a causal nexus between [her] membership in a protected class and the adverse employment action." *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 n.7(3d Cir. 2003)).

While Morris argues that she was "treated differently than similarly situated employees who were not Black," she does not identify any specific comparators.[3]  In support of her contention that circumstantial evidence "shows a causal nexus" between her race and termination, *id.* at 195, she maintains: (1) another Black male had previously complained that Harris had discriminated against him on the basis of race; (2) no Black employees remained under Harris's supervision after Morris was terminated; and, (3) only Black employees have been terminated from the Count Room within the past three years.

But, these points do not find support in the record.  While another member of the Count Room team did complain to Human Resources about feeling discriminated against by Harris, that person's complaint was lodged almost a year after Morris was fired.  And, although Harris testified in a deposition that the only employees who had been terminated in the last three years were Black, the document used to support that conclusion compels a different conclusion.  It shows that four people were fired in that time frame.  While none of them were White, two

---

[3] In briefing her retaliation claim, Morris argues that there is a factual dispute as to whether non-Black employees were written up for the same behavior as her, but she does not argue that said fact would establish comparators for the purposes of her disparate treatment claim.  And in any event, the only adverse action Morris identifies in her brief is her termination—not the issuing of the three PINs, which occurred five months beforehand.  As explained in evaluating her retaliation claim more fully below, even assuming that a reasonable factfinder could infer that there was some racial motivation in Harris issuing her PINs, the inference would have "dissipate[d]" by the time Morris was fired five months later.  *Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017) (internal quotations omitted).

(including Morris) were Black, one was Hispanic or Latino and another is listed as "two or more races" with no indication of what those races are.

As for her assertions about she was the only Black employee in the Count Room at the time she was fired and that only non-White employees have been fired from the Count Room over the last three years, such "raw numbers" are "not probative of . . . alleged discriminatory motive." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 542-43 (3d Cir. 1992) (citations omitted) (holding that evidence that only a small number of women had been admitted to law firm partnership did not establish the firm's discriminatory motive without more, such as evidence of how many women attempted to join the partnership or were eligible to do so).  And as for the fact that another employee subsequently complained about Harris's treatment of him, Morris has "not produced any evidence connecting [said] discrimination," which occurred to someone else, over a year later, to the adverse action of which she complains, namely "her firing." *Onely*, 697 F. Supp.3d at 423 (citing *Makky*, 541 F.3d at 214; *Smith v. RB Distrib., Inc.*, 498 F. Supp.3d 645, 655 (E.D. Pa. 2020)).

None of the facts presented by Morris reasonably support the inference that she was terminated for discriminatory reasons.  Accordingly, she has failed to establish her *prima facie* case, and the Casino's Motion for Summary Judgment shall be granted as to her discrimination claim.

### C.  Retaliation

Morris's retaliation claims under Section 1981 and the PHRA are also evaluated under the *McDonnell Douglas* framework set forth above.  *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017).

### i.    Section 1981

Her *prima facie* retaliation case under Section 1981 would be established by evidence that: "(1) she engaged in [protected] activity . . . ; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quotation omitted).  In such a retaliation case, the "'protected activity'" that the plaintiff engages in, which purportedly spurred the employer's retaliation, must be "complain[ing] about activity that [itself] would establish a violation of Section 1981's guarantee." *Argentina v. Gillette*, 2018 WL 623680, at *3 (E.D. Pa. Jan. 30, 2018) (quoting *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010)).  Therefore, "'a plaintiff must demonstrate that there had been an underlying [S]ection 1981 violation'" to support a retaliation claim.  *Castleberry*, 863 F.3d at 267 (quoting *Estate of Oliva*, 604 F.3d at 798); *see also Anderson v. Boeing Co.*, 694 F. App'x 84, 88 n.11 (3d Cir. 2017) (noting that a Section 1981 retaliation claim "carries the additional requirement that [the plaintiff] show an underlying [Section] 1981 violation.").

For example, if Morris had established that she had been subject to discrimination or harassment in violation of Section 1981 before she was terminated, and that she had complained about said violation, she would be able to use said complaints as the "protected activity" to satisfy her Section 1981 *prima facie* retaliation case.  *Cf. Argentina*, 2018 WL 623680, at *3 ("Here, because no allegations suggest a violation of Section 1981's guarantee," when plaintiff had failed to adequately plead a Section 1981 discrimination claim, the plaintiff "likewise [could not] claim" retaliation in violation of Section 1981).

But Morris has failed to establish any predicate Section 1981 violation about which she

complained.  The record evidence for the predicate is the same as for her hostile work
environment claim which, as set forth above, she has not established.  Therefore, because no
underlying Section 1981 violation has occurred, she has failed to establish a Section 1981
retaliation claim.  *Id.*

As such, the Casino's Motion for Summary Judgment as to her Section 1981 retaliation
claim shall be granted.

### ii.    PHRA

The *prima facie* case for a PHRA retaliation claim is coextensive with Title VII.  *Jones*,
198 F.3d at 410.  So, at step one, Morris must evince evidence that: "(1) she engaged in
[protected] activity . . . ; (2) the employer took an adverse employment action against her; and
(3) there was a causal connection between her participation in the protected activity and the
adverse employment action."  *Moore*, 461 F.3d at 340-41.  The parties dispute elements one and
three, but not two.  Because the third—causation—is dispositive here, the first need not be
considered.

Morris argues that her termination was spurred by her complaints to Harris and her
supervisors regarding the "favoritism" she witnessed and the "nitpicking" she experienced.  To
establish a causal connection between her complaints and termination, Morris can rely on
"temporal proximity" between the two events, if said proximity is "unusually suggestive."
*Moody*, 870 F.3d at 221 (quotations omitted); *see also Farrell*, 206 F.3d at 279-80.
Alternatively, she can prove causation by showing "a pattern of antagonism coupled with
timing" suggestive of retaliation.  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267
(3d Cir. 2007).  Causation requires that the plaintiff "establish a link between . . . her protected
behavior and subsequent discharge."  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.

14

1997).  Causation is evaluated "from the record as a whole."  *Farrell*, 206 F.3d at 281.

As regards Morris's first complaint to Harris—in May or June of 2021—about Harris "nitpicking" her, the record indicates that she was terminated over a year later.  And her complaints to Harris's superiors, after she was first written up, occurred at least five months before she was terminated.  As such, there is no "inference of 'unduly suggestive' temporal proximity" between the complaints and her termination.  *Moody*, 870 F.3d at 221 (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (holding that after "three months or more," said inference "begins to dissipate").

Morris nevertheless argues that the PINs, headband search, Devil-branded wine, and time off mix-up were all the kind of "antagonism coupled with timing" that might suggest retaliation, *DeFlaminis*, 480 F.3d at 267, because most of those events occurred after her first complaint to Harris's superiors.  But such facts pale in comparison to the "constant barrage of written and verbal warnings and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until discharge," which are the types of facts that would normally satisfy the element of causation through a theory of antagonism coupled with timing.  *Roberts v. Am. Airlines*, 599 F. Supp.3d 222, 231 (E.D. Pa. 2022) (cleaned up).

Because Morris has failed to establish a causal link between her protected activity and any adverse employment action, the Casino's Motion for Summary Judgment shall be granted as to her PHRA retaliation claim.[4]

---

[4] In her briefing, Morris elides steps one and three of the *McDonnell Douglas* framework.  In her view, she can show that the Casino's proffered reasons for terminating her are pretext, and that also supports her argument establishing the causation element of her *prima facie* case.  Assuming *arguendo* she is correct that pretext can support causation, her arguments in favor of pretext are not persuasive.  First, she argues that because she was "replaced" by a non-Black employee, and such evidence "gives rise to an inference of discrimination."  But such evidence is insufficient to warrant "automatically infer[ring] discrimination by the employer."  *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp.3d 571, 595 (E.D. Pa. 2017) (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 353 (3d Cir. 1999)).

An appropriate order follows.

**BY THE COURT:**

S/ **WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, J.**